## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FORD and PHILLIP SCHWARTZ, individually and as representatives of a class of participants and beneficiaries on behalf of the Takeda Pharmaceuticals U.S.A., Inc. Savings and Retirement Plan, | Civil Action No. 1:21-cv-10090-WGY |
| *Plaintiffs*, | CLASS ACTION |
| v. | |
| TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS U.S.A., INC. EXECUTIVE COMPENSATION COMMITTEE, AND JOHN DOES 1–14. | |
| *Defendants*. | |

## AMENDED COMPLAINT

1.     Plaintiffs Robert Ford and Phillip Schwartz, individually and as representatives of a class of participants and beneficiaries of the Takeda Pharmaceuticals U.S.A, Inc. Savings and Retirement Plan ("Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee, and John Does 1–14 for breach of fiduciary duties under ERISA.[1]

2.     The marketplace for retirement plan investment options, including

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461. All Defendants are collectively referred to as "Defendants."

target date funds, is established and competitive with numerous investment managers providing target date funds that offer a proven performance history, with consistent and stable management. Multi-billion-dollar defined contribution plans, like the Plan, have tremendous bargaining power to obtain these high-quality investment management products that provide consistent, stable and strong performance.

3. As fiduciaries to the Plan, Defendants are obligated to act prudently, diligently and for the exclusive benefit of Plan participants and beneficiaries in ensuring that, among other things, the Plan's investments are prudent and remain prudent. These duties are the "highest known to the law" and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

4. Instead of acting diligently and prudently, Defendants retained a suite of unproven collective investment trust target date funds as investment options in the Plan, known as the Northern Trust Focus Funds ("Focus Funds"). The Focus Funds suffered from significant and ongoing quantitative deficiencies and turmoil resulting in massive underperformance relative to that of well-established, prudently managed, comparable target date funds that were available to the Plan. Given these deficiencies, a prudent fiduciary would have removed the Focus Funds and replaced them with a prudent investment alternative, which would have avoided millions of dollars in losses suffered by Plan participants who invested in these funds.

5.     In addition, despite the Plan's tremendous bargaining power to demand lower fees to benefit participants and beneficiaries, Defendants selected and retained higher-cost investments when identically managed, yet lower-cost investments, were readily available.

6.     To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty.

## JURISDICTION AND VENUE

7.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

8.     **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where at least one of the alleged breaches took place and where Takeda Pharmaceuticals U.S.A., Inc. is headquartered.

9.     **Standing.** An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). A plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29

U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs on behalf of the Plan.

10.     To the extent Plaintiffs must also show individual injuries even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have suffered such injuries from being subjected to the fiduciary breaches alleged herein, including being invested in the Focus Funds which Defendants retained as the Plan's target date fund option. The named Plaintiffs also suffered harm to their individual accounts as a result of the Defendants selecting and retaining higher-cost shares of the Plan's investments.

## PARTIES

### The Takeda Pharmaceuticals U.S.A., Inc. Savings and Retirement Plan

11.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) in which certain employees of Takeda Pharmaceuticals may participate.

12.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1), last amended and restated effective January 1, 2016.

13.     Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching

contributions, and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan.

14.     As of December 31, 2014, the Plan had $1.4 billion in net assets and 7,784 participants with account balances. By December 31, 2018, the Plan had grown to $1.8 billion in net assets and 8,712 participants with account balances.

15.     Based on assets, the Plan is among the largest 0.03% of all defined contribution plans in the United States. Industry professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command outstanding investment products with established performance histories, stable management, and very low fees.

## I.     Plaintiffs

16.     Robert Ford is a former employee of Takeda Pharmaceuticals U.S.A., Inc. He resides in Thousand Oaks, California and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Phillip Schwartz is a former employee of Takeda Pharmaceuticals U.S.A., Inc. He resides in San Francisco, California and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

## II.     Defendants

18.     Defendants Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"), is a Delaware corporation and a wholly owned subsidiary of Takeda Pharmaceutical Company Limited, a Japanese limited company headquartered Tokyo, Japan.

Takeda Pharmaceuticals U.S.A., Inc.'s headquarters are in Lexington and Cambridge, Massachusetts.[2]

19.    Takeda is the Plan Sponsor under 29 U.S.C. §1002(16). Takeda also is the employer of the Plan's other fiduciaries also named as Defendants herein.

20.    Based on information available, Takeda acts as a named fiduciary and plan administrator to the Plan under 29 U.S.C. §1102(a)(2).

21.    As alleged herein, Takeda exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

22.    The Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee ("Compensation Committee") and its individuals are named fiduciaries under 29 U.S.C. §1102(a)(2).[3] The members of the Compensation Committee, past and current, are presently unknown to Plaintiffs.

23.    As alleged herein, the Compensation Committee and its individual members exercise discretionary authority or discretionary control respecting the management of the Plan, exercise authority or control respecting the management or disposition of Plan assets, and/or have discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C.

_____

[2]https://www.takeda.com/4ab39a/siteassets/en-us/home/who-we-are/company-information/takeda_usa_factsheet-2019_june_v3.pdf
[3] Takeda Pharmaceuticals U.S.A., Inc. Savings and Retirement Plan Summary Plan Description, 2020.

§1002(21)(A)(i) and (iii).

24.     Plaintiffs are currently unaware of the identity of any additional individuals who had or exercised discretionary authority or discretionary control over the management of the Plan, including members of the Compensation Committee. These individuals are included collectively as John Does 1−14. Once those individuals are identified, if any, Plaintiffs will substitute the names of those individuals.

25.     Plaintiffs do not have access to all of the material facts relating to the inner workings of fiduciary responsibility and management over the Plan and do not have access to Defendants' actual decision-making process with respect to the exercising of fiduciary responsibility and management over the Plan, including the selection and retention of Plan investments. Defendants are uniquely and solely in possession of this information as this information is not made available to Plaintiffs or Plan participants.[4]

## ERISA'S FIDUCIARY STANDARDS

26.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
>     (A) for the exclusive purpose of

---

[4] In their motion to dismiss, Defendants do not challenge or take issue with Plaintiffs' allegations pertaining to those entities or committees responsible as fiduciaries to the Plan. Doc. 18 at 10.

(i)  providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

[and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

27.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection and retention of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

28.    An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id*. When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re*

*Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id*. at 435.

29.     Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

30.     A fiduciary's process in performing these functions "must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Penn et. al.*, 923 F.3d 320, 329 (3d Cir. 2019).

31.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in

the administration of his specific responsibilities which give rise
to his status as a fiduciary, he has enabled such other fiduciary
to commit a breach; or

(3)   if he has knowledge of a breach by such other fiduciary, unless
he makes reasonable efforts under the circumstances to remedy
the breach.

## BACKGROUND FACTS

32.   "Defined contribution plans dominate the retirement plan scene

today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private

sector, such plans have largely replaced the defined benefit pension plans that were

America's retirement system when ERISA was enacted in 1974. The consulting firm

Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that

the type of retirement plan offered by the companies has essentially flipped over the

last three decades.[5] The survey found that whereas in 1985, 89 of the Fortune 100

companies offered a traditional defined benefit plan; in 2012, only eleven of the

Fortune 100 companies offered defined benefit plans to newly hired employees.

Defined contribution plans have become America's retirement system.

33.   A fundamental difference between traditional pension plans and

defined contribution plans is that in the former, the employer's assets are at risk.

Because the employer is responsible for funding the pension plan to satisfy its

commitments to employees, it bears all investment risks. In a defined contribution

plan, the employees and retirees bear all investment risks.

34.   Each participant in a defined contribution plan has an individual

---

[5] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON
RESEARCH INSIDER, Oct. 2012.

account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. The fiduciaries have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts.

35.     The Plan's fiduciaries also have control over the expenses charged to participants. The investment alternatives chosen by the Plan's fiduciaries each have their own fees, usually expressed as a percentage of assets under management, or "expense ratio." For example, if a fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). (One basis point is equal to 1/100th of one percent.) The fees deducted from a fund's assets reduce the value of the shares and hence reduce the returns that participants receive on their investments.

36.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[6] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[7]

---

[6] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[7] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

## I.  Target Date Funds as investment options in 401(k) plans

37.     The first target date funds were offered as early as 1994 and since that time, the market of target date funds has exploded with numerous investment managers offering a variety of different target date fund investments. By the mid-2000s, numerous target date funds that had consistent management and established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years of more.

38.     Target date funds are designed to provide a single diversified investment vehicle for participants. Target date funds are offered and managed as a suite of funds typically identified by the participant's target retirement date, which corresponds to the year the participant is likely to retire.

39.     Multiple asset classes comprise a target date fund portfolio, including equity and fixed income securities. As a result, target date funds are often referred to as multi-asset class funds. An investment in a single target date fund can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified and well-performing portfolio.

40.     This is because target date funds rebalance their portfolios to become more conservative as the participant gets closer to retirement. This rebalancing occurs based on the fund's glide path. A glide path determines how the fund's target asset allocations across those underlying assets are expected to change over time and how they become more conservative as the target retirement date approaches. For this reason, the "target date" refers to the participant's target retirement date. For instance, target date "2030" funds are designed for individuals who intend to

retire in 2030. Thus, as the year 2030 approaches, the underlying assets in the target date fund become more conservative.

41.     Target date funds are commonly offered as mutual funds or collective investment trusts. Mutual funds are pooled investment vehicles, which are registered investment companies under the Investment Company Act of 1940. Mutual funds are offered to retail and institutional investors, which are commonly provided within defined contribution plans. Collective investment trusts are investment vehicles maintained by a bank that consist of pooled assets of "retirement, pension, profit sharing, stock bonus or other trusts exempt from Federal income tax." 29 CFR §9.18(a)(2). Collective investment trusts and mutual funds are similar in that both invest in a variety of securities to create a diversified investment portfolio.

42.     Target date funds are often divided into two broad categories — "To" or "Through" target date funds. A "To" target date fund refers to the fund's glidepath, which is designed to allocate its underlying assets to the most conservative investments at the year of the target retirement date retirement. In contrast, a "Through" target date fund utilizes a glidepath that continues its progression to its most conservative asset allocation through the target retirement date. This date approaches the life expectancy of the participant, rather than the date of retirement for the "To" target date funds.

43.     Regardless of the type of target date fund, the development of a target date fund's glide path and corresponding underlying asset allocation are the most

essential components of a target date fund. Constructing and maintaining a prudent glide path and asset allocation for target date funds is very difficult, time-consuming, and requires the input from actuaries and other qualified investment professionals.

44.     Another broad category of a target date fund is whether the fund is actively or passively (or index) managed. With an active fund, the portfolio manager is attempting to select stock or bonds to hold and generate investment returns that exceed the relevant benchmark index return. With a passive fund, the portfolio manager is attempting to mimic the performance of a relevant benchmark return. No stock selection or research is needed, unlike investing in actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and total "expense ratio" than active funds.[8]

45.     For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on the wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan. It is well known in the investment industry that participants rarely make trades in their 401(k) plan account.[9] A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option remains prudent and in the exclusive best

---

[8] The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

[9] Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeshi Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006).

interest of plan participants.

46.     A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants are instructed to invest all their retirement assets in a single target date fund that matches their retirement date to meet their retirement goals. Thus, the significance of a plan's target date fund option underscores the importance of a prudent and diligent process of monitoring all aspects of this critical investment for participants.

47.     A fiduciary must monitor an investment option in a 401(k) plan as a prudent investment professional. This process includes a fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within that fund, and other relevant factors.

48.     With respect to investment returns, a consistent performance history and investment strategy over a period of at least five years demonstrate the ability of the investment manager to generate consistently superior long-term investment results. Diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized benchmarks and prudently managed equivalents.

49.     The measurement against prudently management target date fund

alternatives is critical given that these alternatives represent other investable target date funds available to plan participants, which may be a prudent choice to meet participants' retirement needs.

50.     Given the construction and composition of target date funds, diligent investment professionals perform additional levels of analyses and monitoring to ensure that the selected target date fund remains prudent. Diligent investment professionals not only assess the overall performance of the target date fund, but the underlying investments and allocation of the target date fund. These are separately analyzed to assess any changes to those assets and measure the performance of the underlying assets (*i.e.*, attribution analyses).

51.     During periods of underperformance, diligent investment professionals closely analyze the cause(s) of the underperformance through attribution analyses. Other causes or contributing factors are identified and analyzed, including the amount of turnover (*i.e.*, the amount of buying and selling of the fund's holdings) experienced by the fund and the reasons behind unusually large percentages of turnover.

52.     Relatively high turnover ratios may reveal or indicate an investment manager's lack of experience in consistently managing a target date fund or an attempt to correct underperformance by altering the composition of underlying investments. Any significant turnover in a fund (*e.g.*, more than 30%) warrants close analysis by investment professionals as it can suggest that the manager "is

not following a disciplined investment strategy."[10] Relatively high percentages of turnover also create increased transaction costs in the fund that necessarily detract from performance.

53.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations. This established market included active and passively managed "To" and "Through" target date funds. Established target date fund investment managers included Vanguard, TIAA-CREF, and T. Rowe Price.

54.     Founded on May 1, 1975, Vanguard has offered investment products to investors for over 45 years.[11] T. Rowe Price was founded in 1937, and TIAA-CREF was founded in 1918. All of these investment managers have offered target date funds for over 16 years. From 2010 through 2019, Vanguard, T. Rowe, and TIAA-CREF have provided exceptional target date investment returns to 401(k) plan participants.

55.     In particular, Vanguard has offered target date mutual funds since 2003, and lower-cost collective investment trust versions (I shares) since 2007.[12] Each year from 2012–2017, Vanguard received the highest Morningstar Analyst

---

[10] "Target date turnover troubles big firms," Investment News, Aug. 29, 2010.
[11] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.
[12] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm; Vanguard Target Retirement 2020 Trust I Fact Sheet, https://institutional.vanguard.com/iippdf/pdfs/FS1464.pdf.

Rating for Target-Date Series mutual funds.[13] Vanguard also has been the top target date fund provider (by assets under management) since 2014, and as of 2017, Vanguard had over $381 billion invested in its target date mutual funds.[14] Vanguard's target date mutual funds have been strong performing target date funds,[15] and the Vanguard collective investment trust versions have experienced even better performance because they charge lower fees than their mutual fund equivalents.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE

### I.  Defendants failed to timely remove the consistently underperforming Northern Trust Focus

56.  At all relevant times herein, Defendants maintained the authority to exercise discretionary authority or control over the Plan's investments, including the Plan's target date fund investment options.

57.  In mid to late 2009, Northern Trust Corporation launched a brand-new suite of target date funds named the Northern Trust Focus Funds. The Focus Funds were collective investment trusts, not mutual funds, comprised primarily of index or passive strategies in the various asset classes utilized. Over time, the Focus Funds

---

[13] John Croke, *Vanguard Earns Morningstar Gold,* June 21, 2019, https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvCom VanguardMorningstarGold. Morningstar, Inc. is a leading provider of investment research and investment services and is relied on by industry professionals.

[14] Morningstar, 2019 Target Date Fund Landscape, at 9, 11 https://institutional.vanguard.com/iam/pdf/TDFLNDSCP.pdf.

[15] *E.g.,* Morningstar, 2019 Target Date Fund Landscape at 33; Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

were offered by Northern Trust in various share classes.[16]

58.    Northern Trust informed prospective customers, like 401(k) plan fiduciaries, that the allocation of assets in the underlying classes may change or be adapted strategically to changing market conditions. Northern Trust further informed prospective customers that the glide path for the Focus Funds was "tested" under various scenarios.

59.    Given that the Focus Funds were launched in mid to late 2009, these funds had no live performance history prior to this date. Rather, in promoting these new funds in 2009 and 2010, Northern Trust advertised these funds as being "back-tested." Back-tested performance history means that the represented performance history was generated through the application of quantitative models to create hypothetical performance during the prior period. Diligent investment professionals do not make decisions on an investment based on back-tested or hypothetical performance histories.[17]

60.    In late 2009, in depicting the performance of the Focus Funds dating back 10 years, Northern Trust specifically informed prospective clients that the reported performance did not reflect actual returns but were "hypothetical in nature" given that the Focus Funds were not in existence during the time period

---

[16] Mutual funds and collective investment trusts frequently offer multiple share classes. Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. Based on information available, the precise share class of the Focus Fund utilized in the Plan is not known.

[17] See e.g. "Overfitting And Its Impact On The Investor," MAN AHL Academic Advisory Board, May 2015; "The Deflated Sharpe Ratio: Correcting for Selection Bias, Backtest Overfitting and Non-Normality," Journal of Portfolio Management (2014).

reported. Indeed, Northern Trust disclosed that the reported hypothetical returns were "based on various asset allocation assumptions there were selected with the benefit of hindsight."[18]

61.     In 2010, and only a year after they were created by Northern Trust, Defendants selected the Focus Funds in the Plan. Defendants added the Focus Funds despite the fact that those funds did not have a live performance history of at least five years. In adding the Focus Funds to the Plan, participants' assets in the then-current target date funds, the actively managed Fidelity Freedom Funds, were transferred to the Focus Funds.[19] From this mapping, the Focus Funds comprised a significant amount of the Plan's assets.

| Focus Fund Maturity | Plan Assets Year End 2010[20] |
|---|---|
| Focus Income Fund | $6,309,614 |
| Focus 2005 Fund | $1,168,139 |
| Focus 2010 Fund | $6,537,720 |
| Focus 2015 Fund | $8,743,374 |
| Focus 2020 Fund | $29,085,204 |
| Focus 2025 Fund | $21,776,623 |
| Focus 2030 Fund | $44,955,759 |
| Focus 2035 Fund | $35,234,319 |
| Focus 2040 Fund | $37,859,935 |

[18] The Northern Trust Focus Funds™, "Our Collective Target Date Investment Solution." September 30, 2009.
[19] Plan 2009 Form 5500.
[20] Plan 2010 Form 5500.

| Focus 2045 Fund | $11,770,582 |
| Focus 2050 Fund | $2,740,842 |
| Focus 2055 Fund | $370,384 |

62.     Without *any* meaningful live or actual performance history to consider in evaluating the merit of adding the Focus Funds to the Plan, Defendants were under an obligation to carefully monitor and scrutinize the management and performance of the Focus Funds and analyze in detail the performance of those funds.

63.     Upon the Focus Funds' inclusion in the Plan, and with no meaningful live or actual performance history or demonstration by the portfolio managers that they could effectively manage these funds by providing superior long-term investment returns, the Focus Funds immediately underperformed industry-accepted target date benchmarks for "Through" target date funds used by investment professionals. The S&P target date fund benchmark is one such benchmark. The following chart shows the relative performance of the Focus Funds compared that benchmark.



64. As detailed below, this underperformance continued year after year. By end of year 2013, *all* of the Focus Funds underperformed. Notably, and for the first time as of 2013, the Focus Funds cumulated three years of performance history—all of which underperformed.





65.     As noted above, despite the Focus Funds being passively managed or index funds designed to meet industry-recognized benchmarks, these funds significantly underperformed. This persistent underperformance should have prompted deep analysis by the Defendants as to the cause of this underperformance of these new funds.

66.     Compared to prudent alternative target date funds available to the Plan, the Focus Funds also significantly underperformed, causing the Plan to sustain substantial losses.

67.     A prudent alternative to the Focus Funds was the Vanguard Target Retirement Trust Plus funds. Vanguard has offered target date funds since 2003. The Vanguard Retirement Trust Plus funds were and are passively managed "Through" target date funds, the same as the Focus Funds. The Vanguard Target Retirement Trust Plus funds, which were maintained by an established investment manager with a long tenure, historically performed better than peers and were highly rated by industry professionals. Over the long-term, these funds were one of the top performers in the target date fund market.

68.     The following chart shows the three-year trailing returns of the Focus Funds compared to the Vanguard Target Retirement Trust Plus Funds in 2013. Far from hindsight, this three-year trailing return information is the information Defendants would have seen had they conducted a simple analysis evaluating the Focus Funds and compared to the Vanguard funds.



69. Another prudent alternative to the Focus Funds was TIAA-CREF Lifecycle Index Funds. The TIAA-CREF Lifecycle Index Funds were established funds with over 5 years of performance history as of 2015.

70. During the relevant time period below, these target date funds were and are passively managed "Through" target date funds, the same as the Focus Funds. The TIAA-CREF Lifecycle Index Funds, which were maintained by an established investment manager with a long tenure, historically performed better than peers and were highly rated by industry professionals. Over the long-term, these funds were one of the top performers in the target date fund market.

71. The chart below shows the three-year trailing returns of the Focus Funds compared to the TIAA-CREF Lifecycle Index Funds for 2013.



72.     To the extent a prudent fiduciary determined to offer an actively managed target date fund rather than a passively managed fund, the T. Rowe Price Retirement Funds were an actively managed prudent alternative to the Focus Funds. The T. Rowe Price Retirement Funds were established over 16 years ago. These target date funds were and are actively managed "Through" target date funds, the same as the target date funds in the Plan prior to the Focus Funds.

73.     The T. Rowe Price Retirement Funds, which were maintained by an established investment manager with a long tenure, historically performed better than peers and were highly rated by industry professionals. Over the long-term, these funds were one of the top performers in the target date fund market.

74.     The chart below shows the three-year trailing returns of the Focus Funds compared to the T. Rowe Price Retirement Funds for 2013.

26



75.     The Focus Funds invest exclusively in Northern Trust proprietary index funds. Nevertheless, in 2013, Northern Trust changed 5 out of the 10 index funds in which the Focus Funds invest, resulting in significant and material changes to the underlying assets and allocations of those assets. These significant changes, coupled with the persistent underperformance, should have been analyzed by Defendants as part of any diligent process in assessing the retention of the Focus Funds.

76.     Although the Focus Funds were presented as low-cost index target date funds, the material changes to the underlying asset allocations caused a substantial turnover, which created unusual transaction costs for funds of this nature and design. The average turnover for all of the funds in the Focus Fund series was 90 percent, which is astoundingly high for any investment strategy,

active or passive.

77.     As of 2010, the average turnover for all target date funds was only 23.5%[21] As noted above, turnover that is over 30% warrants close analysis by investment professionals as it can suggest that the manager "is not following a disciplined investment strategy."[22]

78.     The materiality of these changes, coupled with the significant amount of assets invested in these funds, would have caused a diligent investment professional to perform a significant evaluation, including detailed attribution analyses of the Focus Funds. In addition, the high percentage of turnover would have caused a diligent investment professional to conduct an analysis of the experience of the portfolio and investment managers of the Focus Funds.

79.     In light of these material and significant changes, substantial research and due diligence should have been performed relative to the experience of the portfolio managers of the Focus Funds. An in-depth review, as would be performed by a prudent investment professional, would have revealed the contributing factors causing the Focus Funds to significantly underperform, including any strategic changes to those funds Defendants may have been making.

80.     Moreover, this significant underperformance would have caused a diligent investment professional to commence a process designed to consider alternative target date funds to replace the Focus Funds. An analysis of alternative target date funds, including passive or active "Through" target date funds, would

---

[21] "Target date turnover troubles big firms," Investment News, Aug. 29, 2010.
[22] *Id*.

have revealed superior alternative funds with experienced target date fund managers, established performance histories and superior performance as of January 2015, if not before.

81. Despite the above, the Focus Funds remained in the Plan through 2014 and years after with continued substantial underperformance.



82. Based on all the above, given these significant changes to the funds and their persistent underperformance, and allowing sufficient time to make a fund replacement, by the end of the first quarter of 2015, if acting as a diligent and prudent investment professional, Defendants would have removed the Focus Funds.

83. In violation of Defendants' fiduciary obligations, the Focus Funds remained in the Plan and continued to underperform prudent alternatives, causing

substantial losses to the Plan and the participants who invested in the Focus Funds.

84.     By way of example only, between January of 2015 through the end of 2017, the 2030 Focus Fund *underperformed* peer comparators, the Vanguard and TIAA funds, *between 4% and 12%*.

85.     In 2019, and only after substantial losses were incurred from Defendants failing to remove the Focus Funds, the Focus Funds were removed from the Plan.

86.     In maintaining the Focus Funds through 2014 and failing to replace those funds by the First Quarter of 2015, despite the persistent underperformance and upheaval in those funds, Defendants failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so," which is a breach of fiduciary duty. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 788 (7th Cir. 2011). With the information available to Defendants, there was no prudent reason to maintain the Focus Funds in the Plan.

87.     The historically consistent and strong performance of well-established target date funds offered by other companies would have caused a prudent fiduciary to replace the Focus Funds.

88.     By failing to act as a prudent and diligent investment professional, Defendants caused Plan participants to lose substantial retirement assets. Had Defendants removed the Focus Funds and selected the Vanguard target date fund

alternative, Plan participants would not have lost over $22 million of their retirement assets. This is a conservative estimate of the Plan's losses. Had Defendants removed the Focus Funds and selected the TIAA target date fund alternative, Plan participants would not have lost over $32 million of their retirement assets. If a prudent fiduciary was determined to use an actively managed target date fund as the Plan's target date fund solution, the T. Rowe Price target date funds were a prudent selection. Had Defendants removed the Focus Funds and selected the T. Rowe Price target date alternative, Plan participants would not have lost over $36 million of their retirement assets.

## II.   Defendants caused the Plan to pay unreasonable investment management fees.

89.   When providing investments to plan participants, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing RESTATEMENT (THIRD) OF TRUSTS §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." RESTATEMENT (THIRD) OF TRUSTS §90 cmt. b.

90.   It is a simple principle of investment management that the larger amount an investor has available to invest, the lower the investment management fees that can be obtained in the market for a given investment vehicle. Large retirement plans have substantial bargaining power to negotiate low fees for

investment management services through separately managed accounts, collective investment trusts, and lower-cost share classes for mutual fund and collective investment trust investments.

91.     Mutual funds and collective investment trusts frequently offer multiple share classes. The different share classes of a given mutual fund or collective trust have the identical manager, are managed identically, invest in the same portfolio of securities, and allocate their assets the same. The only differences are the fees charged; higher fees necessarily mean investors receive lower returns. The share classes are otherwise identical in all respects.

92.     Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.[23]

93.     Given the Plan was as a large plan based on its size, the Plan had tremendous bargaining power to obtain share classes with far lower costs. Lower-cost share classes of the Plan's investments were readily available. To the extent

---

[23] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR, Jan. 2011, http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

the Plan's investments advertised minimum investment thresholds for the lowest-cost institutional shares, the investment provider would have waived those requirements based on the Plan's size, if the Defendants had requested such a waiver. *See Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010), *affirmed* 729 F.3d 1110 (9th Cir. 2013) (finding based on evidence at trial that "mutual funds will often waive an investment minimum for institutional share classes" for large 401(k) plans, and that "[i]t is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.").

94.     Fund providers explicitly acknowledge the ability of plan fiduciaries to negotiate for lower-cost shares. For instance, Vanguard recognizes this ability and expressly "reserves the right to establish higher or lower minimum amounts for certain investors."[24]

95.     The Defendants had the fiduciary authority or responsibility over the selection and retention of the share class used for each of the Plan's investments. Despite the fact that lower-cost shares for the exact same investment option were available to the Plan, the Defendants selected and continue to maintain higher-cost shares for Plan investment options than were available to the Plan based on its substantial size.

96.     From 2015 to 2019, the Defendants caused the Plan to remain invested

---

[24] *See* Vanguard Funds Multiple Class Plan,
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclassplanvanguardfun.pdf.

in higher cost L, K, and W share classes of the Northern Trust Focus Funds when lower-cost share classes, like the J class, were available since January 2011. Defendants' failure to utilize the available, lower-cost share class of the Focus Funds caused the Plan to pay 150% to 350% more in fees.

97.    The Defendants also maintained other higher-fee share classes of Northern Trust Collective Trust Investments in the Plan, including the Northern Trust Aggregate Bond Index, S&P 500 Index, S&P 400 Index, Russell 2000 Index and ACWI Ex-US Index Funds. All of these Northern Trust investments had a lower cost share class available since 2009.

98.    The Defendants maintained the Plan's investment in a higher-fee share class of the Invesco Stable Value Trust when a lower share class of the same trust was available since 1988.

99.    The Defendants maintained the higher-fee, Investor share class of the Vanguard Prime Money Market Fund when the Admiral share class was available since 1989.

100.    In total, the Defendants caused the Plan to pay over 35%-430% higher investment management fees.

| Fund | Plan's Share Class | Lower Share Class | Plan Paid Excess |
|---|---|---|---|
| NT Focus Funds | 0.05%-0.09% | 0.02% | 150%-350% |
| Invesco Stable Value Trust | 0.26% | 0.19% | 37% |
| Northern Trust Aggregate Bond Index NL | 0.053% | 0.01% | 430% |
| Northern Trust S&P 500 Index NL | 0.020% | 0.01% | 100% |
| Northern Trust ACWI Ex-US Index NL | 0.10% | 0.02% | 400% |

| | | | |
|---|---|---|---|
| Northern Trust S&P 400 Index | 0.03% | 0.01% | 200% |
| Northern Trust Russell 2000 Index | 0.05% | 0.01% | 400% |
| Vanguard Prime Money Market | 0.16% | 0.10% | 60% |

101.   By providing Plan participants the more expensive share classes of Plan investment options, the Defendants caused participants to lose millions of dollars of their retirement savings.

## CLASS ACTION ALLEGATIONS

102.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

103.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as a representative of, the following class:

> All participants and beneficiaries of the Takeda Pharmaceuticals U.S.A, Inc. Savings and Retirement Plan from January 19, 2015 through the date of judgment, excluding the Defendants.

104.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes close to or over 10,000 members and is so

large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: which fiduciaries are liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what the losses to the Plan are resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible

standards of conduct for Defendants in respect to the discharge of their

fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C.

§1109(a), and (B) adjudications by individual participants and beneficiaries

regarding these breaches of fiduciary duties and remedies for the Plan would,

as a practical matter, be dispositive of the interests of the participants and

beneficiaries not parties to the adjudication or would substantially impair or

impede those participants' and beneficiaries' ability to protect their interests.

Therefore, this action should be certified as a class action under Rule

23(b)(1)(A) or (B).

105. A class action is the superior method for the fair and efficient

adjudication of this controversy because joinder of all participants and beneficiaries

is impracticable, the losses suffered by individual participants and beneficiaries

may be small and impracticable for individual members to enforce their rights

through individual actions, and the common questions of law and fact predominate

over individual questions. Given the nature of the allegations, no class member has

an interest in individually controlling the prosecution of this matter, and Plaintiffs

are aware of no difficulties likely to be encountered in the management of this

matter as a class action. Alternatively, then, this action may be certified as a class

under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

106. Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and

adequately represent the interests of the Class and is best able to represent the

interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been

appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

  - "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012).

  - "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013).

  - "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No.

06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

o   U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

o   U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432, at *2.

o   U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th

Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 16-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter Bogard & Denton is also class counsel in and handled *Tibble v.*

*Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter Bogard & Denton successfully petitioned for a writ of certiorari and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[25] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[26] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[27] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[28] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[29] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [30] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[31] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[32] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[33]

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO THE RETENTION OF THE NORTHERN TRUST FOCUS FUNDS

107.    Plaintiffs restate and incorporate the allegations contained in the

preceding paragraphs.

---

[25] http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[26] http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[27] http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[28] http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[29] http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[30] http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[31] http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[32] http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[33] http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

108.    This Count alleges breach of fiduciary duties against all Defendants.

109.    Defendants are required to manage the assets of the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. §1104(a)(1)(B).

110.    Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

111.    In carrying out these responsibilities, Defendants were required to act in a manner consistent with an investment professional in similar circumstances.

112.    Despite these highest duties, Defendants breached their duties of prudence under 29 U.S.C. §1104(a)(1)(B) by retaining the Focus Funds that consistently underperformed and suffered from a variety of ongoing and significant quantitative deficiencies.

113.    Defendants failed to engage in a reasoned decision-making process that the Focus Funds were prudent to be retained in the Plan and failed to engage in a reasoned and diligent process in considering whether participants would be better served by other prudent and better performing alternatives available to the

Plan after considering all relevant factors. Defendants' decision to retain the Focus Funds caused the Plan and participants to incur significant performance losses.

114.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

115.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

116.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C §1104(A)(1)) RELATED TO UNREASONABLE INVESTMENT MANAGEMENT FEES

117.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

118.   This Count alleges breach of fiduciary duties against all Defendants.

119.   The Defendants breached their duties of prudence under 29 U.S.C. §1104(a)(1)(B) by selecting and retaining as Plan investment options higher-cost shares of mutual funds and collective investment trusts that charged unreasonable investment management fees relative to other investment options that were

available to the Plan at all relevant times, including lower-cost share classes for the Plan's mutual fund and collective investment trust investments with the identical investment manager and investments.

120.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

121.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT III: FAILURE TO MONITOR FIDUCIARIES AGAINST DEFENDANT TAKEDA PHARMACEUTICALS U.S.A., INC. AND DEFENDANT TAKEDA PHARMACEUTICALS U.S.A., INC. EXECUTIVE COMPENSATION COMMITTEE

122.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

123.   This Count is asserted against the Defendant Takeda Pharmaceuticals U.S.A., Inc. and Defendant Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee, along with its past and current members that are presently unknown.

124.   Based on information presently available, Defendant Takeda Pharmaceuticals U.S.A., Inc. is authorized to appoint members of the Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee and its John Doe members and, therefore, had a duty to monitor the performance of those appointees related to the fulfillment of their fiduciary duties. Each Executive Compensation Committee member and fiduciary likewise had a duty to monitor the performance of each member of the Executive Compensation Committee and a responsibility to monitor each individual or entity to whom it delegated any fiduciary responsibilities.

125.   A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge their duties.

126.   To the extent any of the fiduciary responsibilities of Defendant Takeda Pharmaceuticals U.S.A., Inc. and/or the Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

127.   Defendant Takeda Pharmaceuticals U.S.A., Inc. and/or the Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee breached their fiduciary monitoring duties by, among other things:

a.  failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.  failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable fees and imprudent investment options in violation of ERISA;

c.  failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

d.  failing to remove appointees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to Plan participants and imprudent investment options to be retained in the Plan, all to the detriment of Plan participants' retirement savings.

128.   As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had Defendants Takeda Pharmaceuticals U.S.A., Inc., the Takeda Pharmaceuticals U.S.A., Inc. Executive Compensation Committee, and the other delegating fiduciaries discharged their fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

## JURY TRIAL DEMANDED

129.   Under Fed. R. Civ. P. 38 and the Constitution of the United States,

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- certify the Class, appoint Plaintiffs as class representatives, and appoint Schlichter Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

April 19, 2021                                  Respectfully submitted,

/s/ Jerome J. Schlichter
Jerome J. Schlichter (*pro hac vice*)
Troy A. Doles (*pro hac vice*)
Heather Lea (*pro hac vice*)
Sean E. Soyars (*pro hac vice*)
Schlichter Bogard & Denton LLP
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com

*Lead Counsel for Plaintiff*


Robert T. Naumes, BBO # 367660
Christopher Naumes, BBO # 671701
NAUMES LAW GROUP
2 Granite Ave, #425
Milton, Massachusetts 02186
617-227-8444
617-696-2437 (fax)
robert@naumeslaw.com
christopher@naumeslaw.com

*Local Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of April, 2021, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF filing system.

/s/ Jerome J. Schlichter
Jerome J. Schlichter