UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FORD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TAKEDA PHARMACEUTICALS U.S.A., INC., et al., <br><br> Defendants. | No. 1:21-cv-10090-WGY |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO MOTION TO DISMISS [DOC. 26]**

Jerome J. Schlichter (*pro hac vice*)
Troy A. Doles (*pro hac vice*)
Heather Lea (*pro hac vice*)
Sean E. Soyars (*pro hac vice*)
SCHLICHTER BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com

*Lead Counsel for Plaintiffs*

Robert T. Naumes, BBO # 367660
Christopher Naumes, BBO # 671701
NAUMES LAW GROUP
2 Granite Ave, #425
Milton, Massachusetts 02186
617-227-8444
617-696-2437 (fax)
robert@naumeslaw.com
christopher@naumeslaw.com

*Local Counsel for Plaintiffs*

**CONTENTS**

Authorities .................................................................................................................ii

Introduction ............................................................................................................. 1

Background .............................................................................................................. 1

   I.    The Takeda Pharmaceuticals U.S.A, Inc. Savings and Retirement Plan .............. 1

  II.    Plaintiffs' claims .......................................................................................... 3

      A.   Imprudent monitoring and retention of Northern Trust Focus Funds (Count I) 4

      B.   Higher-cost shares of Plan investments (Count II)............................................ 7

Argument ................................................................................................................. 8

   I.    The well-pleaded facts need only raise a plausible inference of
        misconduct. ................................................................................................... 8

  II.    Plaintiffs plausibly allege breaches of fiduciary duty (Counts I–II) ................. 10

      A.   The alleged facts plausibly show a breach of fiduciary duty. ......................... 11

      B.   Takeda's remaining arguments provide no basis for dismissal....................... 16

         1.   Takeda's exhibits are improper ............................................................. 16

         2.   Takeda improperly parses the complaint ................................................ 17

         3.   The complaint does not rely on hindsight or time-barred events................ 18

         4.   Takeda's disputes regarding proper benchmarks are unavailing ................ 18

         5.   Belated removal of imprudent options does not excuse Takeda's breach .... 20

 III.    Plaintiffs plausibly allege a breach of the duty to monitor (Count III). .............. 20

Conclusion ............................................................................................................. 20

# AUTHORITIES

## Cases

*Ahmed v. Liberty Mutual Group, Inc.*,
No. 20-30056-MGM, Doc. 44 (D. Mass. June 15, 2021) ........................................................ 10

*Anderson v. Intel Corp.*,
No. 19-4618, 2021 WL 229235 (N.D. Cal. Jan. 21, 2021) .................................................. 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 9

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) .............................................................................................. 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 9

*Bell v. Pension Comm. of ATH. Holding Co.*,
No. 15-2062, 2017 WL 1091248 (S.D. Ind. Mar. 23, 2017) .............................................. 11

*Bowers v. BB&T Corp.*,
No. 15-732 Doc. 58 (M.D.N.C. Apr. 18, 2016) .............................................................. 11

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ........................................... 3, 9, 10, 11, 12, 13, 15, 17

*Brotherston v. Putnam Investments, LLC*,
907 F.3d 17 (1st Cir. 2018), *cert. denied*, 140 S. Ct. 911 (2020) ........................................ 9, 19

*Brotherston v. Putnam Investments, LLC*,
No. 15-13825-WGY, 2016 WL 1397427 (D. Mass. Apr. 7, 2016) ...................................... 10

*Brown-Davis v. Walgreen Co.*,
No. 19-5392, 2020 WL 8921399 (N.D. Ill. Mar. 16, 2020) ............................................ 14, 20

*Bunch v. W.R. Grace & Co.*,
555 F.3d 1 (1st Cir. 2009) .............................................................................................. 10

*Cardigan Mountain Sch. v. New Hampshire Ins. Co.*,
787 F.3d 82 (1st Cir. 2015) ............................................................................................ 8, 9

*Cassell v. Vanderbilt Univ.*,
285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ...................................................................... 11

*Cates v. Trs. of Columbia Univ.*,
No. 16-6524, 2017 WL 3724296 (S.D.N.Y. Aug. 28, 2017) .............................................. 11

*Clark v. Duke Univ.*,
No. 16-1044, 2017 WL 4477002 (M.D.N.C. May 11, 2017) .............................................. 11

*Cunningham v. Cornell Univ.*,
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ................................................................ 11

*Daugherty v. Univ. of Chi.*,
   No. 17-3736, 2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) ................................................ 11

*Davis v. Washington Univ. in St. Louis*,
   960 F.3d 478 (8th Cir. 2020)................................................................................... 15, 20

*Divane v. Northwestern Univ.*,
   953 F.3d 980 (7th Cir. 2020), *cert. granted sub. nom. Hughes v. Northwestern Univ.*,
   No. 19-1401 (July 2, 2021) ..................................................................................... 15

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ................................................................................ 9, 20

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ............................................................................................... 3

*Freeman v. Town of Hudson*,
   714 F.3d 29 (1st Cir. 2013) ................................................................................... 16

*Fudge v. Penthouse Int'l, Ltd.*,
   840 F.2d 1012 (1st Cir. 1988) ............................................................................... 16

*García-Catalán v. United States*,
   734 F.3d 100 (1st Cir. 2013) ................................................................................... 9

*George v. Kraft Foods Global, Inc.*,
   641 F.3d 786 (7th Cir. 2011)........................................................................... 11, 13

*George v. Kraft Foods Global, Inc.*,
   674 F.Supp.2d 1031 (N.D.Ill. 2009) ...................................................................... 11

*Henderson v. Emory Univ.*,
   252 F. Supp. 3d 1344 (N.D. Ga. 2017) .................................................................. 11

*In re Quest Diagnostics Inc. ERISA Litig.*,
   No. 20-07936, 2021 WL 1783274 (D.N.J. May 4, 2021) ........................................ 11

*In re Unisys Sav. Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996)............................................................................. 11, 13

*Kelly v. Johns Hopkins Univ.*,
   No. 16-2835, Doc. 45 (D. Md. Sept. 28, 2017)...................................................... 11

*Krueger v. Ameriprise Fin., Inc.*,
   No. 11-2781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) ................................... 11

*Kruger v. Novant Health, Inc.*,
   131 F. Supp. 3d 470 (M.D.N.C. 2015).................................................................. 11

*McGowan v. Barnabas Health, Inc.*,
   No. 20-13119, 2021 WL 1399870 (D.N.J. Apr. 13, 2021) ..................................... 11

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018)....................................................................... 17, 18, 19

*Miller v. Astellas US LLC*,
    No. 20-3882, 2021 WL 1387948 (N.D. Ill. Apr. 13, 2021) .................................................... 16

*Moitoso v. FMR LLC*,
    451 F.Supp.3d 189 (D. Mass. 2020) .................................................................................... 3

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    No. 15-9936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ............................................. 11, 18

*Nicolas v. Trustees of Princeton Univ.*,
    No. 17-3695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) ............................................... 11, 18

*Pinnell v. Teva Pharm. USA, Inc.*,
    No. 19-5738, 2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) .................................................... 18

*Pledger v. Reliance Tr. Co.*,
    240 F. Supp. 3d 1314 (N.D. Ga. 2017) .................................................................................. 11

*Ramos v. Banner Health*,
    No. 15-2556, 2017 WL 4337598 (D. Colo. Sept. 29, 2017) .................................................... 16

*Sacerdote v. New York Univ.*,
    No. 16-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ................................................... 11

*Short v. Brown Univ.*,
    320 F. Supp. 3d 363 (D.R.I. 2018) ........................................................................................ 11

*Sweda v. Univ. of Pennsylvania*,
    923 F.3d 320 (3d Cir. 2019) *cert. denied*, 140 S.Ct. 2565 (2020) .................. 10, 12, 13, 14, 17

*Taylor v. United Techs. Corp.*,
    No. 06-1494, 2007 WL 2302284 (D. Conn. Aug. 9, 2007) .................................................... 11

*Terraza v. Safeway Inc.*,
    241 F.Supp.3d 1057 (N.D. Cal. 2017) .................................................................................. 11

*Thole v. U. S. Bank N.A*,
    140 S. Ct. 1615 (2020) .......................................................................................................... 2

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015) ........................................................................................................... 2, 3

*Tibble v. Edison Int'l*,
    843 F.3d 1187 (9th Cir. 2016) (en banc) ............................................................................ 3, 14

*Tracey v. Mass. Inst. of Tech.*,
    No. 16-11620, 2017 WL 4478239 (D. Mass. Oct. 4, 2017) ............................................... 11, 15

*Troudt v. Oracle Corp.*,
    No. 16-175, 2017 WL 1100876 (D. Colo. Mar. 22, 2017) ..................................................... 11

*Turner v. Schneider Elec. Holdings, Inc.*,
    No. 20-11006-NMG, 2021 WL 1178308 (D. Mass. Mar. 26, 2021) ................................. 10, 20

*Tussey v. ABB, Inc.*,
  850 F.3d 951 (8th Cir. 2017) ................................................................................ 19

*Vellali v. Yale Univ.*,
  308 F. Supp. 3d 673 (D. Conn. 2018) ................................................................. 11

*Wildman v. Am. Century Servs., LLC*,
  237 F. Supp. 3d 902 (W.D. Mo. 2017) ............................................................... 11

**Statutes**

26 U.S.C. §401(k) ..................................................................................................... 1

29 U.S.C. §1002(34) ................................................................................................. 2

29 U.S.C. §1102(a) ................................................................................................... 1

29 U.S.C. §1104(a)(1)(B) ................................................................................. 3, 13

29 U.S.C. §1109(a) ................................................................................................... 8

**Rules**

Fed. R. Civ. P. 12(d) ......................................................................................... 16, 17

Fed. R. Civ. P. 56(d) ............................................................................................... 17

Fed. R. Civ. P. 8(a)(2) ............................................................................................... 8

**Other Authorities**

Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans,
  75 Fed. Reg. 64,910 (Oct. 20, 2010) ................................................................. 20

Restatement (Second) of Trusts (1959) ................................................................. 13

## INTRODUCTION

Plaintiffs' amended complaint sets forth detailed facts showing that Takeda Pharmaceuticals imprudently administered Plaintiffs' retirement plan, causing millions of dollars in lost retirement savings. Despite a market teeming with experienced investment managers with strong performance records, Takeda decided to gamble participants' retirement savings on untested funds and stood idly by year after year as the Plan's losses mounted, long past the time when a prudent fiduciary would have jettisoned the funds. Courts routinely find that similar allegations state plausible claims for relief. Defendants identify no basis for dismissal.

## BACKGROUND

### I.      The Takeda Pharmaceuticals U.S.A, Inc. Savings and Retirement Plan

Plaintiffs Robert Ford and Phillip Schwartz, former employees of Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"), are among the 8,700 participants in the Takeda Pharmaceuticals U.S.A., Inc. Savings and Retirement Plan ("Plan"). Am. Compl. ("AC") ¶¶14, 16–17 (Doc. 22). The Plan is governed by the Employee Retirement Income Security Act (ERISA). Plaintiffs seek to represent a class of all participants since January 19, 2015. AC ¶103.

Defendants are the Plan's fiduciaries, including Takeda and a committee of Takeda executives ("Committee"). AC ¶¶18–25. Takeda and the Committee are the Plan's named fiduciaries with authority over Plan management and administration. AC ¶¶20, 22; *see* 29 U.S.C. §1102(a). For ease of reference, Plaintiffs will refer to all Defendants collectively as "Takeda."

The Plan is of the type defined by ERISA as a "defined contribution" plan (AC ¶11),[1] meaning Plan "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer

---

[1] Private sector defined contribution plans are commonly referred to as 401(k) plans. 26 U.S.C. §401(k).

contributions, less expenses." *Tibble v. Edison Int'l (Tibble I)*, 575 U.S. 523, 525 (2015); *see* 29 U.S.C. §1002(34). With $1.8 billion as of 2018, the Plan is among the largest 0.03% of all defined contribution plans in the United States, and thus has a level of bargaining power in the ultra-competitive market for plan services that few plans enjoy. AC ¶¶2, 14–15.

Plan participants can allocate their investments among a menu of options, but determining which options are on the menu is within the fiduciary's (Takeda's) exclusive control. AC ¶¶13, 34, 56. Thus, "the plan fiduciaries' particular investment decisions" in a defined contribution plan can dramatically affect participants' retirement benefits. *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020). The practical effect of a fiduciary's decision to retain imprudent investments is to shrink participants' "nest eggs" and in some cases to significantly delay or preclude altogether the participants' ability to enjoy a secure retirement. AC ¶36.

The potential adverse effects of retaining imprudent options are particularly pronounced in the context of a defined contribution plan's target-date fund option. Such funds are designed as a "one-stop" option for participants who do not want to actively reallocate their accounts among various equity and fixed income options to achieve a diversified portfolio. AC ¶¶38–39. Target-date funds are marketed as a suite with each fund in the suite having a specified date that corresponds to an investor's target retirement date (*e.g.*, investors in the "2030" fund intend to retire near 2030). AC ¶¶38, 40. Each fund's portfolio is automatically rebalanced over time to become more conservative as its target date approaches (*e.g.*, a "2030" fund currently has a more conservative portfolio than a "2040" fund). AC ¶40. A target-date fund's rebalancing formula is known as its "glide path," and may be designed to either go "To" or "Through" the target date. AC ¶¶40, 42. Because a target-date option is designed to be a single diversified portfolio, participants who opt to invest in a target-date fund typically allocate their entire account balance

to the fund. AC ¶¶38–39, 46. Accordingly, an imprudent target-date option can have a devastating impact on participants' retirement savings. AC ¶45.

## II.    Plaintiffs' claims

ERISA achieves its purpose of protecting participants by imposing upon plan fiduciaries "strict standards of trustee conduct … derived from the common law of trusts," including "a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416, 419 (2014). The statute requires fiduciaries to act "solely in the interest of the participants" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). These duties are "the highest known to the law." *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 203–04 (D. Mass. 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)).

To define "the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble I*, 575 U.S. at 528–29. Under trust law, the duty of prudence does not end upon the initial selection of an investment. *Id.* at 529. Rather, prudence entails "a continuing duty to monitor trust investments and remove imprudent ones." *Id.*, Prudent monitoring requires attention not only to investment performance, but also cost: "cost-conscious management is fundamental to" prudent investing and "[w]asting beneficiaries' money" is imprudent. *Tibble v. Edison Int'l (Tibble II)*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (en banc) (analyzing trust law authorities). Thus, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble I*, 575 U.S. at 530.

Here, Plaintiffs allege two ways that Takeda failed to properly monitor the Plan's investments and remove imprudent ones. *First*, Takeda imprudently retained the Northern Trust Focus Funds ("Focus Funds") as the Plan's target-date option until 2019, despite their limited

and abysmal performance and high turnover. AC ¶¶37–88, 107–16. *Second*, Takeda imprudently provided higher-cost shares of certain options instead of lower-cost institutional versions of the same funds available to the Plan because of its enormous size.[2] AC ¶¶89–101, 117–21.

### A.    Imprudent monitoring and retention of Northern Trust Focus Funds (Count I)

The industry-standard practice of prudent fiduciaries is to monitor investment options by regularly reviewing factors such as a fund's performance history, the portfolio manager's experience, and any changes to the fund's investment strategy or holdings. AC ¶47. When initially selecting an investment, a consistent performance history and strategy of at least five years provides a reasonable basis to conclude that the manager can generate consistently superior long-term performance. AC ¶48. Ongoing performance monitoring involves regularly comparing a plan's target-date funds' performance to appropriate benchmarks and alternative target-date funds in the market. AC ¶¶48–49. Prudent and diligent fiduciaries also employ additional methods to monitor plan investments, including attribution analyses to determine the cause of any underperformance. AC ¶¶50–51.

One potential cause of underperformance is turnover—buying and selling of the fund's holdings. AC ¶51. A high turnover ratio can be a signal of manager inexperience or an attempt by the manager to remedy underperformance by changing the fund's holdings. AC ¶52. According to industry experts, a turnover ratio greater than 30% may show that the manager "is not following a disciplined investment strategy" and warrants close monitoring. AC ¶52.

As of 2010 (when Takeda selected the Focus Funds for the Plan), the target-date fund market included numerous options with an established record of strong performance by stable and experienced managers, including funds managed by Vanguard, T.Rowe Price, and TIAA-

---

[2] Count III, based on failure to monitor other fiduciaries, is derivative of Counts I and II. AC ¶¶122–28.

CREF. AC ¶¶53–54, 61. Each of these managers' target-date offerings follows a "Through" strategy and has at least 16 years of performance history. AC ¶¶54, 67, 70, 72. Vanguard, an investment manager for over 40 years and a target-date fund manager since 2003, has achieved particularly exceptional results, earning a top rating for six consecutive years from investment analyst Morningstar and holding an industry-best $381 billion under management. AC ¶55.

In contrast to the established performance records of the top target-date funds in the market, the Northern Trust Focus Funds did not exist until mid-to-late 2009. AC ¶57. Northern Trust marketed the funds by claiming that their glide path, which follows a "Through" strategy, had been "tested" and could be strategically adapted. AC ¶58. Because the Focus Funds had no live performance history at the time, Northern Trust advertised "back-tested" performance—*i.e.*, hypothetical past performance based on asset allocation decisions implemented with the benefit of hindsight and divorced from the real-world conditions to which managers must react in real time. AC ¶¶59–60. Such hypothetical performance is a metric rejected by prudent fiduciaries in evaluating whether to include an investment in a defined contribution plan. AC ¶59.

In contrast to the standard fiduciary practice of evaluating a full five years of live performance before selecting a new investment, Takeda put the Focus Funds into the Plan in 2010, only one year into their existence, at a time when the Funds had a minimal live performance history. AC ¶61. To implement the Focus Funds into the investment lineup, Takeda transferred or "mapped" over $200 million in Plan assets from the prior target-date option (Fidelity Freedom Funds) to the newly created Focus Funds. AC ¶61.

It quickly became apparent that Takeda may have placed a losing $200 million bet on untested funds, using participants' retirement assets to do so. The Focus Funds immediately underperformed industry-standard benchmarks, such as the Standard & Poor's target date fund

benchmark. AC ¶63. By year-end 2013, the first year the Funds had a full three-year performance history, *every fund* in the Focus Funds suite underperformed the index. AC ¶64.

Not only did the Focus Funds underperform industry-standard target-date benchmarks, they also underperformed established target-date fund alternatives with similar "Through" strategies managed by Vanguard, T.Rowe Price, and TIAA-CREF. AC¶¶66–74. Each of these options was highly-rated due to excellent long-term performance and would have been a prudent alternative to the Focus Funds. AC ¶¶67, 70, 72–73.

The Focus Funds' performance issues were accompanied by major changes in asset holdings and extremely high turnover. AC ¶¶75–76. In 2013, Northern Trust changed five of the 10 underlying index funds in which the Focus Funds invest, resulting in increased transaction costs and a *90%* turnover rate. *Id.* By way of comparison, the industry average turnover rate was only 23.5%. AC ¶77. Because even a 30% rate can indicate the lack of a "disciplined" strategy, the Focus Funds' *90%* rate should have been a major red flag. AC ¶¶77–79.

This combination of factors—the Funds' limited performance history, significant underperformance, material changes in fund holdings, extreme levels of turnover, and the Plan's large investment in the Funds—would have prompted a prudent fiduciary to closely monitor the Focus Funds and scrutinize whether they remained prudent options for the Plan. AC ¶¶62, 65, 75, 77–78. Such monitoring would have included attribution analyses and due diligence regarding the portfolio managers' experience and the reasons for changes in asset holdings, to determine the causes of the Focus Funds' underperformance. AC ¶¶78–79. A prudent and diligent fiduciary under the circumstances also would have investigated whether participants would be better served by replacing the Focus Funds with an alternative in the market. AC ¶80.

Takeda evidently failed to thoroughly and diligently review the Focus Funds to make a

reasoned decision, because the Funds remained in the Plan thereafter. AC ¶86. Had Takeda

closely monitored the Funds as the circumstances dictated, Takeda would have seen that the

Focus Funds continued to drastically underperform the S&P target date index during 2014. AC

¶81. Thus, even if the Funds' problems as of year-end 2013 were not reason enough to prompt

removal, a prudent monitoring process and the Funds' severe 2014 underperformance would

have resulted in replacement of the Focus Funds by the first quarter of 2015. AC ¶¶82, 86–87.

Takeda, however, did not remove the Focus Funds until 2019. AC ¶85. Until their removal,

the Focus Funds foreseeably continued to underperform prudent alternative target-date funds,

resulting in significant Plan losses. AC ¶¶83, 85. For example, from 2015 through 2017, the

2030 Focus Fund underperformed equivalent Vanguard and TIAA-CREF funds by 4%–12%. AC

¶84. Takeda's failure to prudently monitor the Focus Funds and remove them from the Plan by

2015 caused the Plan to lose up to $36 million compared to what it would have earned if Takeda

had replaced the Focus Funds with a prudent alternative target-date option. AC ¶88.

## B.      Higher-cost shares of Plan investments (Count II)

Many of the Plan's investment options offer multiple classes of shares. AC ¶91. The only

difference between the various share classes of a given fund is the fees charged. AC ¶91. The

share classes are otherwise identical in all respects; each invests in the same portfolio of

securities managed by the same advisor. AC ¶91.

With $1.8 billion in assets, the Plan easily qualified for the lowest-cost share classes of any

option that Takeda chose to include in the Plan. AC ¶¶90, 93. For the Focus Funds and seven of

the Plan's other investment options, however, Takeda provided a higher-cost share class to

participants even though a significantly lower-cost, but otherwise identical, share class of the

*same* fund was available. AC ¶¶95–100. An experienced and prudent investor would have been

aware of the available lower-cost shares, which can be ascertained from fund literature, and

would have opted for the lower-cost options to avoid incurring unnecessary costs. AC ¶92. By using the higher-cost share classes, Takeda caused the Plan to pay wholly unnecessary fees, resulting in Plan losses. AC ¶101.

Plaintiffs seek to recover "any losses to the plan" caused by Takeda's breaches of duty and to obtain appropriate equitable relief. 29 U.S.C. §1109(a), §1132(a)(2).

## ARGUMENT

Considered as a whole, the amended complaint's allegations raise a strong inference that Defendants acted imprudently in retaining the Northern Trust Focus Funds as Plan investment options and providing higher-cost shares of Plan investments. Although Plaintiffs are not privy to the actual details of Takeda's fiduciary process, the facts that they can and do allege—that Takeda retained the Focus Funds in the Plan for nearly a decade despite immediate and severe underperformance and other red flags—raises an inference that Takeda had a flawed process for monitoring Plan investments. Although Takeda provides various purported explanations to create the impression that it might have had valid reasons for its decisions, the plausibility standard does not require Plaintiffs to disprove such possibilities at this stage. Choosing between the parties' competing versions of events is a task for the factfinder. Because the alleged facts raise a plausible inference of imprudence, the motion should be denied.

## I.     The well-pleaded facts need only raise a plausible inference of misconduct.

A complaint is sufficient if it provides "a short and plain statement of the claim showing that the pleader is entitled to relief." *Cardigan Mountain Sch. v. New Hampshire Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015) (citing Fed. R. Civ. P. 8(a)(2)). This plausibility standard is not a "probability requirement"; a plaintiff "need not demonstrate that [it] is likely to prevail" on its claim. *Id.* at 84, 88 (citations omitted). The alleged facts need only "raise a reasonable expectation that discovery will reveal evidence of" misconduct. *Id.* at 88 (quoting *Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). A court does not determine whether the plaintiff's

theory is "more plausible than other competing inferences," which is a question for the

factfinder. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45–46 (1st Cir. 2013)

("[A]lthough an innocuous interpretation of the defendants' conduct may be plausible, that does

not mean that the plaintiff's allegation that that conduct was culpable is not also plausible.").

Determining whether a particular claim is plausible depends on the underlying elements of

the claim and the particular issue in dispute. *Cardigan*, 787 F.3d at 84. The three elements of a

claim for breach of fiduciary duty are: "breach, loss, and causation." *Brotherston v. Putnam*

*Investments, LLC*, 907 F.3d 17, 30 (1st Cir. 2018), *cert. denied,* 140 S. Ct. 911 (2020). Once

Plaintiffs show a breach and loss, the burden of disproving causation shifts to Takeda. *Id*. at 34–

35, 39. Takeda does not dispute the plausibility of Plan losses. Thus, the issue before the Court is

whether the complaint's factual allegations, "accepted as true," raise a "reasonable inference"

that Takeda breached a fiduciary duty. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Cardigan*,

787 F.3d at 84–85.

Plaintiffs are not required to provide "direct evidence" of exactly how Takeda breached its

duty. *Cardigan*, 787 F.3d at 88. When "a material part of the information needed is likely to be

within the defendant's control" and "it cannot reasonably be expected" that the plaintiff could

access that information, "some latitude may be appropriate." *García-Catalán v. United States*,

734 F.3d 100, 104 (1st Cir. 2013) (citation omitted). That is the situation here: ERISA plaintiffs

have "limited access to crucial information" before discovery. *Braden,* 588 F.3d at 598. ERISA's

prudence standard is a test of conduct. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44–45 (1st

Cir. 2018). Yet details about the fiduciary's conduct are in the fiduciary's exclusive possession.

*Braden*, 588 F.3d at 598. "If plaintiffs cannot state a claim without pleading facts which tend

systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Id*.

Accordingly, it is enough if the complaint's circumstantial allegations raise a reasonable inference that Takeda's fiduciary process "was flawed" due to a "failure of effort, competence, or loyalty." *Id.* at 594, 596; *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019) *cert. denied*, 140 S.Ct. 2565 (2020)(circumstantial evidence allowed court to "'reasonably infer' that a breach had occurred.").

## II.   Plaintiffs plausibly allege breaches of fiduciary duty (Counts I–II)

ERISA's prudence standard requires a thorough and reasoned process for plan investment decisions. *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 6, 10 & n.9 (1st Cir. 2009). That "process must bear the marks of loyalty, skill, and diligence expected of *an expert* in the field." *Sweda*, 923 F.3d at 329 (emphasis added). The sufficiency of the process depends on "the totality of the circumstances." *Bunch*, 555 F.3d at 6. Thus, claims regarding the reasonableness of fiduciary conduct involve "inherently factual questions." *Sweda*, 923 F.3d at 329. Given the factually complex nature of fiduciary duty claims, "dismissal is often inappropriate" before the record can be developed. *Brotherston v. Putnam Investments, LLC*, No. 15-13825-WGY, 2016 WL 1397427, at *1 (D. Mass. Apr. 7, 2016).

Courts, including several decisions in this District, have overwhelmingly denied motions to dismiss similar claims. *Ahmed v. Liberty Mutual Group, Inc*., No. 20-30056-MGM, Doc. 44 (D. Mass. June 15, 2021) (allegations that fiduciary "retained imprudent investment options" with a "consistent history of underperformance" stated plausible claim); *Turner v. Schneider Elec. Holdings, Inc.*, No. 20-11006-NMG, 2021 WL 1178308, at *3–5 (D. Mass. Mar. 26, 2021) (allegations that fiduciaries chose funds with "insufficient performance histories" instead of superior alternatives and "failed to obtain identical lower-cost investment options" stated

plausible claim); *Tracey v. Mass. Inst. of Tech.*, No. 16-11620, 2017 WL 4478239, at *2 (D.

Mass. Oct. 4, 2017).[3] Plaintiffs' factual allegations here compel the same conclusion.

A.      **The alleged facts plausibly show a breach of fiduciary duty.**

In selecting investments for a plan, "the most basic" fiduciary obligation is "an independent

investigation into the merits" of the investment. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435

(3d Cir. 1996). A failure "to balance the relevant factors and make a reasoned decision" is a

breach. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011). Allegations that a

fiduciary "failed adequately to evaluate the investment options included in the Plan" state a claim

for breach of fiduciary duty. *Braden*, 588 F.3d at 589–90, 595–96.

*Braden* and *Sweda* reversed dismissal of allegations similar to those in Counts I and II here.

In *Braden*, the fiduciaries of a large plan with substantial bargaining power (1) provided higher-

cost shares of plan investments instead of identical lower-cost institutional shares, and (2) failed

to change the available investment options even though "most of them underperformed the

---

[3] *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-07936, 2021 WL 1783274, at *3–5 (D.N.J. May 4, 2021); *McGowan v. Barnabas Health, Inc.*, No. 20-13119, 2021 WL 1399870, at *5–8 (D.N.J. Apr. 13, 2021); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 686–88 (D. Conn. 2018); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371–72 (D.R.I. 2018); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1066–67 (M.D. Tenn. 2018); *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7–8 (S.D.N.Y. Sept. 29, 2017); Mem. to Counsel at 2, *Kelly v. Johns Hopkins Univ.*, No. 16-2835, Doc. 45 (D. Md. Sept. 28, 2017); *Nicolas v. Trs. of Princeton Univ.*, NO. 17-3695, 2017 WL 4455897, at *4–5 (D.N.J. Sept. 25, 2017); *Daugherty v. Univ. of Chi.*, No. 17-3736, 2017 WL 4227942, at *7–8 (N.D. Ill. Sept. 22, 2017); *Cates v. Trs. of Columbia Univ.*, No. 16-6524, 2017 WL 3724296, at *2 (S.D.N.Y. Aug. 28, 2017); *Sacerdote v. New York Univ.*, No. 16-6284, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017); *Clark v. Duke Univ.*, No. 16-1044, 2017 WL 4477002, at *2 (M.D.N.C. May 11, 2017); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1349–52 (N.D. Ga. 2017); *Terraza v. Safeway Inc.*, 241 F.Supp.3d 1057, 1075–77 (N.D. Cal. 2017); *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1326–27, 1331–32 (N.D. Ga. 2017); *Bell v. Pension Comm. of ATH. Holding Co.*, No. 15-2062, 2017 WL 1091248, at *4 (S.D. Ind. Mar. 23, 2017); *Troudt v. Oracle Corp.*, No. 16-175, 2017 WL 1100876, at *2 (D. Colo. Mar. 22, 2017); *Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 914 (W.D. Mo. 2017); *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016); Order, *Bowers v. BB&T Corp.*, No. 15-732 (M.D.N.C. Apr. 18, 2016); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 474–78 (M.D.N.C. 2015); *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, 2012 WL 5873825, at *9–11 (D. Minn. Nov. 20, 2012); *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1048–49 (N.D.Ill. 2009); *Taylor v. United Techs. Corp.*, No. 06-1494, 2007 WL 2302284, at *2–4 (D. Conn. Aug. 9, 2007).

market indices they were designed to track." *Braden*, 588 F.3d at 595–96 & n.5. These facts and others supported a plausible inference of a flawed fiduciary process. *Id*. at 596. Although the defendant may have had valid reasons for retaining the challenged options—"including potential for higher return, lower financial risk, more services offered, or greater management flexibility"—the plaintiff was not required to "rebut all possible lawful explanations for a defendant's conduct" on a motion to dismiss. *Id.*

*Sweda* followed the same approach. The plaintiff alleged that the fiduciary breached its duties by, *inter alia*, "paying unreasonable investment fees" and retaining funds "with historically poor performance compared to available alternatives." 923 F.3d at 331. "[D]espite the availability of low-cost institutional class shares," the defendant provided "identically managed but higher cost" shares, as shown by "a table comparing options in the Plan with the readily available cheaper alternatives." *Id.* The plaintiff further alleged that many of the plan's options "underperformed appropriate benchmarks," and provided specific examples of how the defendant "failed to remove underperformers." *Id.* Evaluating the complaint "holistic[ally]," the court concluded that the alleged facts, including "specific comparisons between returns on Plan investment options and readily available alternatives, as well as practices of similarly situated fiduciaries," plausibly established that the defendant failed to "perform its fiduciary duties with the level of care, skill, prudence, and diligence to which Plan participants are statutorily entitled under § 1104(a)(1)." *Id*. at 332. The defendant's argument "that it did in fact employ a prudent process" was a merits issue and "misplaced" at the pleading stage. *Id.* at 332–33.

The complaint here contains the same elements that *Braden* and *Sweda* found sufficient to plausibly allege a breach of fiduciary duty. Plaintiffs allege that despite the availability of identically managed lower-cost institutional shares of Plan options, Defendants provided higher

cost shares, as set forth in a table comparing options in the Plan with the readily available cheaper alternatives. AC ¶¶95–100; *see Sweda*, 923 F.3d at 331; *Braden*, 588 F.3d at 595 & n.5. Plaintiffs provide specific comparisons between returns on the Plan's Focus Funds and readily available alternatives and show that the Focus Funds consistently underperformed appropriate benchmarks and market indices. AC ¶¶63–64, 66–74, 81, 83–84; *see Sweda*, 923 F.3d at 331–32; *Braden*, 588 F.3d at 596. Plaintiffs also identify investment monitoring practices of similarly situated fiduciaries—including attribution analyses, monitoring high rates of turnover, rejecting back-tested performance, and reviewing alternatives in the market—to show what others "acting in a like capacity and familiar with such matters would [do] in the conduct of an enterprise of a like character and with like aims," in contrast to what Takeda did. AC ¶¶47–52, 59; *see Sweda*, 923 F.3d at 332 (quoting 29 U.S.C. §1104(a)(1)(B)). Thus, for the same reasons stated in *Sweda* and *Braden*, Counts I and II plausibly allege a breach of fiduciary duty.

Each count is also sufficient under other general fiduciary principles.

**Count I.** An ERISA fiduciary is "duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property,'" after conducting an independent investigation and making a reasoned decision. *Unisys*, 74 F.3d at 434–35 (quoting Restatement (Second) of Trusts § 227 (1959)); *George*, 641 F.3d at 796.

Takeda selected the Focus Funds for the Plan even though they had only a one-year performance history, and retained the funds despite immediate and sustained underperformance, high turnover, and changes in fund strategy, long after it became apparent that the funds were no longer a prudent option (if they ever were). AC ¶¶56–88; *see supra*, 4–7. It is reasonable to infer that a prudent fiduciary objectively analyzing the target-date fund market as if he were looking for a place to invest his own money would not favor untested funds over established, award-

winning options like Vanguard and others, and would not stick with the untested option after it underperformed and exhibited other indicia of imprudence. It is reasonable to infer that a fiduciary using the appropriate investment monitoring methods would have detected the Focus Funds' severe underperformance and issues with the Funds' turnover and strategy changes. It is reasonable to infer that a diligent fiduciary would keep apprised of other options in the market and conclude that participants' interests would be better served by changing to a target-date option that was not plagued by persistent underperformance and upheaval. Accordingly, it is reasonable to infer that a prudent fiduciary in like circumstances would have replaced the Focus Funds years earlier, thereby avoiding millions of dollars in Plan losses.

Another court recently denied a motion to dismiss based on a large 401(k) plan's retention of the same Northern Trust target-date funds. *Brown-Davis v. Walgreen Co.*, No. 19-5392, 2020 WL 8921399, at *1–3 (N.D. Ill. Mar. 16, 2020). The court rejected many of the same arguments that defendants make here, including that the benchmark and comparator funds cited in the complaint were inappropriate. *Id.* at *2. This Court should reach the same conclusion.

**Count II.** "It is beyond dispute that the higher fees charged to a beneficiary, the more the beneficiary's investment shrinks." *Tibble II*, 843 F.3d at 1198. ERISA fiduciaries are therefore obligated to "understand and monitor plan expenses." *Sweda*, 923 F.3d at 328. Fiduciaries of large plans are obligated to consider lower-cost shares of plan investments: "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble II*, 843 F.3d at 1198; *Sweda*, 923 F.3d at 329. Thus, courts have consistently found that when a fiduciary fails to obtain identically managed lower-cost shares, it is reasonable to infer that the fiduciary was "asleep at the wheel." *Davis v.*

14

*Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020); *Tracey*, 2017 WL 4478239, at *2 ("If defendants did, in fact, include higher fee options when identical lower fee options were available, they failed to act with the 'care, skill and prudence' required by ERISA.").

For the Focus Funds and seven additional Plan options, Takeda provided a higher-cost version of the option even though lower-cost institutional versions were readily available to the $1.8 billion Plan. AC ¶¶105–10. The lower-cost versions would have provided identical investment management because the different share classes invest in the same portfolio of securities managed by the same advisor. *Id.* ¶¶106–09. Because a diligent fiduciary would have known that such superior alternatives were available and would have opted for the lower-cost version to avoid incurring unnecessary fees, it is reasonable to infer that Takeda "failed to act with the 'care, skill and prudence' required by ERISA." *Tracey*, 2017 WL 4478239, at *2.

Takeda's argument for dismissal of Count II primarily relies on a Seventh Circuit case in which the Supreme Court has now granted certiorari. *See* Mem. in Support (MIS) 18 (Doc. 27) (citing *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020), *cert. granted sub. nom*. *Hughes v. Northwestern Univ.*, No. 19-1401 (July 2, 2021)). In recommending a grant of certiorari, the government asserted that the Seventh Circuit's dismissal of the share-class allegations was "incorrect" and based on a mistaken "understanding of the substantive obligations that ERISA imposes on plan fiduciaries." Br. for the U.S. as Amicus Curiae 1, 8–13, 19, *Hughes v. Northwestern Univ.*, No. 19-1401.[4] The government endorsed *Sweda* and *Davis*, on which Plaintiffs rely here. *Id.* at 10, 17–20; *see supra*, 15. The government's views often carry weight in ERISA actions. *See Braden*, 588 F.3d at 597 & n.8 (adopting government's position on pleading standards). Thus, *Divane* and similar cases are of questionable validity.

---

[4] https://www.supremecourt.gov/DocketPDF/19/19-1401/180105/20210525160954238_19-1401%20Hughes%20-%20US%20invitation%20brief%20final.pdf.

**B.      Takeda's remaining arguments provide no basis for dismissal.**

**1.      Takeda's exhibits are improper**

Subject to "narrow exceptions," a court on a motion to dismiss "ordinarily may only consider facts alleged in the complaint and exhibits attached thereto, or else convert the motion into one for summary judgment." *Freeman v. Town of Hudson*, 714 F.3d 29, 35–36 (1st Cir. 2013); Fed. R. Civ. P. 12(d). Takeda asserts, in a footnote, that the Court may consider various exhibits purportedly "referenced in the Amended Complaint or integral to Plaintiffs' claims," including "investment materials and Plan-related documents, including participant disclosures." MIS 3 n.1. But Takeda fails to show that the cited documents are in fact sufficiently referenced in the complaint (or even referenced in the complaint at all) or to explain how any of its exhibits are supposedly integral to Plaintiffs' claims. Courts in similar ERISA fiduciary breach cases have rightly rejected defense counsel's attempt to do this on a motion to dismiss.[5]

A complaint's "passing reference" to a document "does not constitute incorporation by reference." *Freeman*, 714 F.3d at 36. Takeda's documents also are not "central" to any claim. *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988). A document is central if the plaintiff would necessarily have to rely on it to prove its case, such as an allegedly libelous publication or a controlling written instrument. *Id.*

There is nothing like that here. Takeda is merely attempting to introduce various documents which may be relevant *pieces* of evidence—but none of which can fairly be deemed integral—to dispute the alleged facts and prematurely present a one-sided defense on the merits. That is

---

[5] *Miller v. Astellas US LLC*, No. 20-3882, 2021 WL 1387948, at *3 (N.D. Ill. Apr. 13, 2021) (excluding 23 exhibits which were neither integral to nor incorporated into the complaint); *Ramos v. Banner Health*, No. 15-2556, 2017 WL 4337598, at *4 (D. Colo. Sept. 29, 2017) (rejecting attempt to use outside "documents" "to disprove Plaintiffs' contrary allegations" because such "arguments fundamentally raise factual and evidentiary disputes that are not properly resolved on a Rule 12(b)(6) motion.").

improper. Considering such materials would inevitably require the Court to weigh Takeda's exhibits against Plaintiffs' allegations and to resolve disputed facts. Such evidentiary submissions must await summary judgment, so that both sides can make a full record, including expert testimony, as to (1) the causes of the Focus Funds' underperformance, (2) appropriate benchmarks, and (3) the materiality of purported differences between the Focus Funds and the comparators cited in the complaint. *See* Fed. R. Civ. P. 12(d), 56(d).

### 2.     Takeda improperly parses the complaint

Takeda parses the complaint "piece by piece" to argue that "each allegation, in isolation" does not rise to the level of a fiduciary breach. *Cf. Sweda*, 923 F.3d at 331 (quoting *Braden*, 588 F.3d at 594). Takeda argues that standing alone, a "bare allegation" of underperformance (MIS 7, 16–17), *or* a fund's high turnover ratio, *or* its inexperienced manager (MIS 14–16), do not raise an inference of a breach of fiduciary duty. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 n.4 (8th Cir. 2018) (mere allegation of "failure to invest in Vanguard, *without more*," was not a breach) (emphasis added). Takeda ignores that a complaint must be "read as a whole." *García-Catalán*, 734 F.3d at 103; *Sweda*, 923 F.3d at 331 (employing a "holistic" evaluation).

Plaintiffs do not rely solely on an allegation of hindsight underperformance, without more. Rather, it is the "totality of the specific allegations in this case" that raises an inference of imprudence. *See Braden*, 588 F.3d at 596 & n.7. Defendants' cases which are limited to a bare allegation of underperformance are thus unlike the combination of facts here: that the untested Focus Funds had only back-tested performance, *and* immediately underperformed upon selection, *and* had turnover multiples higher than industry averages, *and* changed five of 10 underlying funds in the portfolio, *and* continued to underperform for several more years, *and* still Takeda waited until 2019 to remove the Funds. *See supra*, 4–7. Although Takeda contends that *Anderson* is "remarkably similar" (MIS 8), among other distinctions, the plaintiffs there made no

allegation that the challenged funds had insufficient performance histories or exorbitant turnover. *Cf. Anderson v. Intel Corp.*, No. 19-4618, 2021 WL 229235, at *7–8 (N.D. Cal. Jan. 21, 2021).

### 3. The complaint does not rely on hindsight or time-barred events

The claim has nothing to do with hindsight as Takeda contends. MIS 16–17. By the start of the class period in 2015, the Focus Funds had *already* developed a sustained track record of underperformance and excessive turnover. AC ¶¶63–78. It was thus entirely foreseeable that those problems would continue. Although Takeda further contends that the pre-2015 allegations concern events that are time-barred (MIS 14–15), Takeda's cries of "hindsight" show exactly why it was necessary to include those pre-class period allegations in the complaint. Had Plaintiffs omitted them, Takeda surely would have doubled down on the "hindsight" argument. While Plaintiffs are not seeking to hold Takeda liable for the initial selection of the Focus Funds, the facts regarding the Funds' pre-2015 problems are nevertheless relevant to show what Takeda knew, which bears upon the prudence of its monitoring process during the class period.

### 4. Takeda's disputes regarding proper benchmarks are unavailing

Takeda raises a host of factual disputes and objections to the comparator funds cited in the complaint, claiming that they are not sufficiently "meaningful benchmarks" or involve "apples-to-oranges" comparisons. MIS 7–13. Courts do not resolve factual disputes regarding "the accuracy" of "comparisons to alternative funds" on a motion to dismiss. *Pinnell v. Teva Pharm. USA, Inc.*, No. 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020); *Nicolas v. Trustees of Princeton Univ.*, No. 17-3695, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017); *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-9936, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016). Determining whether a benchmark is sufficiently "meaningful" unavoidably requires "factual findings," as even Takeda's case recognizes. *See Meiners*, 898 F.3d at 823 & n.4. At summary judgment and trial, expert opinion will analyze which is the best benchmark, and

whether certain asset allocation or strategy distinctions are material to a prudent investor.

Moreover, *Meiners* holds that a "market index" is a "meaningful benchmark" at the pleading

stage. *Id*. at 823. The complaint's S&P target-date benchmark is just such an index. AC ¶¶63–64.

Takeda's assertion that it is improper to compare active and passively managed funds (MIS

9–10) is contrary to First Circuit law, which Takeda neglects to cite. *Brotherston v. Putnam*

*Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018) (approving comparison of underperforming

actively managed funds to "index mutual funds or market indexes."). Because Plaintiffs' theory

is that Takeda could have replaced the Focus Funds with another passive manager *or* an active

manager, it is proper to compare both types. *See id*.; AC ¶¶67, 70, 72. Takeda also misleadingly

portrays *Tussey* (MIS 11), neglecting to mention that the court *approved* a comparison between

dissimilar funds to calculate damages, finding "[t]he *reason* for any difference in returns [to] be

immaterial" for that purpose. *Tussey v. ABB, Inc.*, 850 F.3d 951, 960 (8th Cir. 2017).

Although Takeda is correct that the *fees* of mutual funds and collective trusts may not be

comparable, that is because a mutual fund's fees typically cover a wider array of services, such

as SEC reporting. MIS 5, 9–10. There is no factual basis to extend that logic to investment

performance. Indeed, because mutual fund fees are typically *higher* than collective trusts, which

acts as a drag on performance, comparing the collective trust Focus Funds to mutual funds makes

the Focus Funds' performance look *better* than if Plaintiffs had cited equivalent collective trusts.

AC ¶55. Takeda cannot credibly complain about a comparison that favors its position.

Takeda mistakenly contends that the Focus Funds' "published" benchmark is necessarily

superior. MIS 13–14. The validity of that benchmark is undermined by the fact that it is created

by Northern Trust, which has an incentive to manipulate the benchmark to make the Focus Funds

look like good performers. Indeed, the possibility of such "manipulation" is why the Department

of Labor mandates the use of a "broad-based securities market index" that is not created by the manager or its affiliate. *See* Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 Fed. Reg. 64,910, 64,916–64,917 (Oct. 20, 2010).

Takeda's various objections boil down to a contention that the only "meaningful" benchmark is another investment that is identical to the Focus Funds in every way—style, asset holdings, strategy, etc. If that were the law, no investment could ever be deemed imprudent, and it would be impossible to prove a plan's losses. Resolving Takeda's disputes is an issue for trial.

### 5. Belated removal of imprudent options does not excuse Takeda's breach

Takeda further asserts that because it eventually removed the Focus Funds in 2019 and certain share classes changed over the class period, the Court should draw an inference of prudent monitoring in Takeda's favor. MIS 17, 19. Even if Takeda's proposed inference were one plausible version of events, it is also plausible that Takeda unduly delayed in removing the Focus Funds for the first four years of the class period, delayed implementing share-class changes for several years, and also failed to switch shares for other funds altogether. That "means that this claim cannot end here." *Davis*, 960 F.3d at 483; *Evergreen*, 720 F.3d at 45–46.

## III. Plaintiffs plausibly allege a breach of the duty to monitor (Count III).

When a complaint plausibly alleges an underlying breach, a derivative monitoring claim survives to the same extent. *Turner*, 2021 WL 1178308, at *7; *Brown-Davis*, 2020 WL 8921399, at *4. Because the complaint states underlying claims for relief in Counts I and II, Count III should also proceed. Although Takeda suggests otherwise (MIS 20), the amended complaint gives Takeda fair notice of the grounds for the asserted monitoring failures. AC ¶¶124–27.

### CONCLUSION

For these reasons, Defendants' motion to dismiss should be denied.

July 2, 2021

Respectfully submitted,

/s/ Sean E. Soyars
Jerome J. Schlichter (*pro hac vice*)
Troy A. Doles (*pro hac vice*)
Heather Lea (*pro hac vice*)
Sean E. Soyars (*pro hac vice*)
SCHLICHTER BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com

*Lead Counsel for Plaintiffs*

Robert T. Naumes, BBO # 367660
Christopher Naumes, BBO # 671701
NAUMES LAW GROUP
2 Granite Ave, #425
Milton, Massachusetts 02186
617-227-8444
617-696-2437 (fax)
robert@naumeslaw.com
christopher@naumeslaw.com

*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 2, 2021.

/s/ Sean E. Soyars